Good morning, Your Honors. May it please the Court, my name is Mary Ann Dugan. I represent the plaintiff-appellant Stephanie Weinstein. I would like to reserve three minutes for rebuttal. I take to heart the Court's request that we get to the point since we only have ten minutes on each side. I think this is an interesting but not all that complicated legal issue on appeal, the main issue on appeal, which is can a police officer be insulated from an error of law as to what a party's rights are under the law? Why is it an error of law? The error is in what is the content of the court document as to who has the right to occupy the property, which, you know, if you had been told that only X has the right to be on the property, then as a legal matter, that would be a correct proposition. I'm not stating that very well, but why isn't that a factual error rather than a legal error? No, I understand your question, Your Honor. I think that there are two issues that are responsive to that. One, in depositions, as I explained in the opening brief, it became very clear that all of the officers involved in the two entries onto the property shared the mistaken belief that a co-tenant could exclude a non-resident co-tenant. Let's say that's right, counsel. Don't you have a mixed question of fact and law just like under ROTA? Well, I think that the second issue, answer to the question which I was going to get to, which is that the cases that have addressed erroneous belief as to what a court order or a warrant says, I think that is a mixed issue of fact and law. And under the circumstances, haven't the courts been clear, certainly our court has been clear, that if a police officer is told by the police computer, in this case, that X is true and it turns out not to be true as a matter of fact, but the officer believed it to be so, that that can establish probable cause. On the other hand, if an officer makes a mistake of law, that is not exculpatory. But under ROTA, if you've got a mixed question of fact and law, then the officer is exculpated, isn't he? That may be the case, but that was not what happened here. Why not? Because in this case, the officer who reported to the second entry onto the premises, Officer Harrison, he testified, whatever the order said or didn't say or whether or not it existed, I just knew that Sergeant Flynn had conducted some sort of investigation along with the- But he knew that because he checked the police record, and the police record indicated that. Isn't that correct? No, that's not correct. And the record at ER 124, he testified he does not recall reading the police report, the CAD report, and no one described the court order to him or confirmed that there was one. Where did he get the information, though, about the previous understanding of the discussion with your client on the first visit to the property? Where did that come from? In part from her ex-partner, the co-tenant, who insisted that he was the sole owner, according to a court order, that Sergeant Flynn had been out earlier and had trespassed Ms. Weinstein from the property. But was there not thereafter a check by the officer with someone at the police headquarters or the computer? No, that is not clear from the record at all. The officer, Harrison, did not say that during deposition, did not say that he relied upon any review of the police report. The police report itself is not-was not cited in the-I'm sorry. So in the deposition, when Officer Harrison was testifying and he was questioned as to why he trespassed Ms. Weinstein, he stated that he relied on an understanding that there was a court order that had determined the parties. I thought, based on what the dispatcher told him? No, he talked to Mr. Magyar, the other co-owner. I thought it- There was something in the database as well that had been placed there incorrectly by someone in the city attorney's office or district attorney's office, right? Right. I think at ER 119 through 24 in that area, I thought there was information about consulting with something on the database, in addition to what Magyar said. That is not my recollection. Let's assume for a moment that that's true. If that's true, doesn't RODA control here? I'm sorry. You're going to have to remind me what RODA is. Okay, RODA. I apologize. That's all right. All right. RODA is RODA v. City of Roseburg, 137, Fed 3rd, 1142. The officer stopped RODA for speeding. He didn't produce a valid vehicle registration. He presented a vehicle title that bore another person's name. The police dispatcher informed the officer that the car that he was driving was reported as stolen. RODA was arrested. It turned out that it was an erroneous report. He sued, just like your client did, and it was found that probable cause existed because he relied upon an erroneous statement of fact, and there was a mixed question of fact in law. Well, in that case, it wasn't, literally speaking, a mixed question of fact in law because the first officer who had written the erroneous report did not make an error of law. In this case, if you agree with the defendants, what happens is that an officer such as Sergeant Flynn, who makes a clear error of law and then puts that into a record, can then insulate anybody who comes later, no matter what documents are presented to them showing that that was an error of law. As here, Ms. Weinstein said, here's my deed. We have these documents. And so it's not just that there was a mistake of fact. There was a clear mistake of law. There's a mixed issue, right? Pardon? Mixed law and fact. It became a fact because the error of law was put into a record. But don't you have to look at this based upon what the officer was experiencing, based on the totality of the circumstances. These folks are out there. You know, they're not lawyers. They're out there trying to do their job, and he has this information. He checks the database. He gets information from your client. He gets information from Madyar. Based upon what he knows, he took the action he thought was appropriate. You agree that he – I thought you were disputing that he checked the computer database. I'm looking at the testimony of Harrison here, and I have to say it's not entirely clear. He says, I had information that the court order existed. I didn't see that court order that I remember. Like I said, Mr. Madyar told me that this court order existed, and whatever the order said or didn't say or whether or not it existed, I just knew that Sergeant Flynn had conducted some sort of investigation along with the district attorney's office and determined that she wasn't to be there. Now, is that all in your view? Is that testimony simply relaying what he was told by Madyar? Well, as you say, it's unclear. What do you think the record is? Who took the deposition? I took the deposition. My memory is that the record showed that he did not have a clear memory as to what he reviewed at the time, but he knew. Did Madyar know that Flynn had talked to the district attorney? That's not clear either. She talked to him when she was outside the house. When who was outside? Sergeant Flynn. Yeah, I thought he – my understanding, I think maybe all – I think maybe Judge Smith is operating on the same assumption I was, that it was not just Madyar who was the source of this information. As I said, it's unclear what the source of the information is, but if you read the CAD report, it is simply a statement that there is some court order. I know what the CAD report says. Okay. But the question is – now, let me just, because you're running out of time, ask one other fact question, which is at the first encounter, she produced the ownership documents, correct? Did she do the same thing at the second time? Did she present Harrison with the ownership papers? I believe she offered and was not given that opportunity. Is that on the record? Yes, I believe it is, and I will look for that. Would you do that? On rebuttal. Okay, thank you. Thank you. You have just a few seconds you might want to save. Thank you. We'll hear next from the city. Please, the court. I'm Bob Sterringer here on behalf of the city of Eugene and Officer Harrison, the defendants in this case. I hope I can provide a bit of clarification on the record on the question of what information did Officer Harrison know and what was the source of it at the scene. If we look at supplemental excerpt of record, page nine, Officer Harrison did testify in his deposition that he had received information from dispatch about the conclusion of the district attorney and Sergeant Flynn that Mr. Maguiar was entitled to sole competency. You recall the timing sequence, counsel. Where did that occur? When did he consult with dispatch in the scheme of things on that second visit? It's his first visit, but the second visit of Ms. Weinstein to the property. As best as I can piece together, he arrives at the scene. He talks to Mr. Maguiar. He talks to the plaintiff. And my recollection of his testimony is that at some point he was made aware that there had been this prior contact. Would that have been Mr. Maguiar suggested by opposing counsel? Well, it might have been, but I can't say that it's clear. At that point, then, is that when he contacted dispatch? From the record, it appears that's when he contacted dispatch or was contacted by dispatch. It's not clear who initiated it, but it was before the arrest, and I think that's clearly the important factor. So that's evident in Officer Harrison's deposition testimony. That information is also found in the custody report. It's clear that he received information about these prior orders, that he had that information at the time the plaintiff was taken into custody, and those are found or the custody report is at ER 64. So I don't think there's any doubt at all that Officer Harrison received the information about these prior orders from an official source. It was not just Mr. Maguiar, and that's very important in distinguishing this case from cases like Beyer and Fronts, where the officers were acting solely on the report of lay people that a restraining order existed that prevented the plaintiff from doing whatever it was they were doing. In those cases, the reason that the officers' actions were deemed to be unreasonable was they relied on lay testimony about the existence of a restraining order and didn't do anything to determine for themselves what the contents of those restraining orders were, let alone whether they actually existed. I gather that the city and Officer Harrison do not contest the accuracy of opposing counsel's view of tenancy and common law in Oregon. Is that correct? By that, I mean that the plaintiff had a right to enter the property and occupy it just as much as Mr. Maguiar did without the benefit of a court order. Without the benefit of the court order, that is correct. That is correct. We wouldn't contest that to be the case, that in a normal situation, if you just had a tenancy and common arrangement where there weren't these other situations, one tenant typically does not have the right to exclude the other. Now, of course, that can be affected by court orders, and in fact, this is a situation, there's evidence in the record of that being the case at the Sorrell property where there was a question about the ownership of that property and a plaintiff was able to exclude, through a restraining order, Mr. Maguiar from that property. So we know that is a possibility. The other thing that I would mention about buyer-in-fronts and these cases that the plaintiff relies on, on this question of the effect of a mistake of law, is in each of those cases, the officers were actually there to enforce the restraining order. That was the law that the plaintiff was accused of violating, and that's not the case here, of course. The plaintiff here was accused of violating the criminal trespass statute. There's no question about whether Officer Harrison understood the law of criminal trespass. Really, all we're talking about is whether these court orders affected the underlying factual elements of a trespass claim. Thank you, Your Honor. And so this is why I think it's more accurate and why the district court was correct in concluding that, at worst, this is a mixed question of fact or law because the import of the orders is simply in establishing whether the plaintiff had a privilege or license to enter and occupy the property. If after the first incident, Ms. Weinstein had tried to find out any information about the basis for her having been trespassed after the first instance, would she have had any access to the CAD report? Would she have gotten that information to know what it was, what was the basis for the police officer's decision the first time? I honestly couldn't tell you whether she would have access to the CAD report. I don't know of any reason why she wouldn't have been. What I do know and what I think is evident on the record is that there was no other report created. And so it is true, as the plaintiff discusses in the briefing, it is true that the plaintiff was told that there was no report that was going to be created. And so she didn't have, I guess, a reason to go to the police and look at that. I'm afraid I can't tell you what her access was. So she didn't have any forewarning. It's a little strange. I mean, one of the problems about this case is that she's going in and changing locks. And after the first time, I was curious why she wouldn't have sought some clarification or offered up some explanation. But then what occurred to me in thinking about that was, how would she know what it was that the police basis was? Well, I believe that the record, I'd have to go back and look at the record, but I believe the record establishes that the plaintiff was aware at the time of the first incident that the reason that Sergeant Flynn concluded that the plaintiff couldn't be on the property was the basis of these court orders. And so I think she was aware of why it was the police at that time believed that. But the court order had expired by the time of the second. The court order had expired. But, of course, unfortunately, Sergeant Flynn either didn't understand that or was under a mistaken impression after consulting with the assistant district attorney on that point. The only other thing I would add about the circumstances of the arrest is the briefing, of course, focuses a lot on these court orders and whatever mistakes were involved with that. But there were other facts and circumstances here, and Officer Harrison's conduct should be measured against the totality of those facts and circumstances. And without belaboring the point, this was the second time that a plaintiff had attempted to gain access to the property with the aid of a locksmith. It was clear that Mr. Magyar was the sole occupant of that property and claimed the right to be the sole occupant. There were other facts and circumstances that, even in the absence of the mistaken understanding about the court orders, would have supported Officer Harrison's conclusion. I don't think I have time to get into the municipal liability questions and everything else, so if there are no other questions, I'll take my leave. I think there aren't. Thank you very much. Thank you. Ms. Dugan? To answer your question, Your Honor, she did not show him the documents. She explains in her declaration, ER-41, that she tried to explain the situation. But, no, she did not try to show him. She did not show him the documents. Okay. Thank you. I think that if you look at the Byer case, obviously it's not 100 percent on point, but in Byer the court noted that the officers had confirmed with the dispatcher that there was a protective order against Byer. It had been issued. It had been served. But they made no attempt to ascertain its terms from authorized personnel or by reading it. And the court said in that situation there was not qualified immunity because the officers are not allowed to simply rely on a vague description of something like that. They have a responsibility to familiarize themselves with the court order's precise contents. And they did not fulfill their duty to do that. In this situation, Sergeant Flynn's behavior was reckless. She was specifically asked by the DA, is there a superseding document after that October 03 modification to the FAPA order? And she said no, even though she had been given the superseding 2004 court order judgment, which gave the parties equal co-tenancy in the property. And she also neglected to note that the FAPA order had expired by its own terms and that it does not bind the petitioner in any way. I see that my time is out. It is. Thank you. We understand your position and we appreciate your argument. Thank you very much, Your Honor. Thank you. The case just argued is submitted. And as I say, we appreciate both counsel's comments here today. The next case on the docket this morning is Mazda Motors versus the motorized vessel Cougar Ace. I think from land to sea. Thank you.
judges: Graber, Fisher, Smith